IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LISA BENARON, an Oregon individual,
                                        Plaintiff,

v.

BRETT SIMIC, a Wyoming individual,
                                        Defendant.

Case No. 3:19-cv-01653-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Dr. Lisa Benaron ("Plaintiff") filed this action against Brett Simic ("Defendant"), alleging claims for intentional interference with business relations, defamation *per se*, false light, civil harassment in violation of OR. REV. STAT. § 30.866(1), and intentional infliction of emotional distress ("IIED").

Now before the Court are Plaintiff's Motion for Summary Judgment and Injunctive Relief and Defendant's Cross-Motion for Summary Judgment. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and the parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the

Court denies Plaintiff's Motion for Summary Judgment and grants in part and denies in part Defendant's Cross-Motion for Summary Judgment.

## BACKGROUND[1]

Before August 2016, Plaintiff and Defendant were close acquaintances. (Joint Stmt. of Agreed Facts ("JSAF") ¶ 1, ECF No. 38.) In August 2016, Plaintiff worked at Enloe Medical Center ("EMC") as a physician. (Decl. of Robert Parker in Supp. of Pl.'s Mot. Summ. J. ("Parker Decl.") Ex. 6 at 74,[2] ECF No. 39-2.) On August 11, 2016, Defendant injured his left ring finger. That same day, Defendant sent Plaintiff two photographs of his injured finger via text message and told Plaintiff that Dr. Hall at EMC "put it back together." (Parker Decl., Ex. 3 at 37.) On August 12, 2016, Defendant texted Plaintiff that a radiologist "just called my fingers [*sic*] broken." (Parker Decl., Ex. 3 at 43.) Plaintiff and Defendant engaged in text conversations throughout August 12, 2016 about Defendant's finger and other topics. On August 14, 2016, Plaintiff texted Defendant and noted "I checked your x-ray. Not clear if there is a fracture per Radiologist. If there is, it is a teeny tiny chip of bone." (Parker Decl., Ex. 3 at 46.) Defendant texted with Plaintiff several times from August 14 through August 16 regarding whether Defendant's finger was fractured.

On August 16, 2016, Defendant filed a complaint with the California Board of Medicine in which he alleged Plaintiff violated the Health Insurance Portability Accountability Act ("HIPAA") when he examined his medical records without his permission. (JSAF ¶ 2.) On August 18, 2016, Plaintiff texted Defendant and directed him not to contact her or she would file

---

[1] Unless otherwise noted, the following facts are undisputed or presented in the light most favorable to the non-moving party.

[2] Citations in this Opinion and Order correspond to CM/ECF generated page numbers.

a restraining order. (Parker Decl., Ex. 3 at 53.) In December 2016, Plaintiff moved to Portland,

Oregon, in part to be closer to her daughter, Molly Steindorf ("Steindorf"), who was attending

the University of Washington. Plaintiff did not tell Defendant that she was moving to Oregon.

On December 19, 2016, Defendant sent University of Washington employee Helen

Garrett an email, in which he reported that Steindorf is not a Washington resident:

> I was given your name to speak with regarding residency requirements for
> an existing student that I don't believe is a Washington resident and is
> trying to get out of the non-residency requirement and higher fees.
> I can give you this information anything [sic] and I hope it will help you in your
> investigation.

(Parker Decl., Ex. 14 at 3, ECF No. 39-4.) Garrett responded to Defendant on January 17, 2017;

asked him if he was "a professor, student, or colleague"; advised him that she would forward his

email to Chief Residency Officer Tina Miller; and told him that neither she nor Miller would "be

able to comment or report back if we investigate the student you will comment on." (Parker

Decl., Ex. 14 at 2.)

On August 9, 2017, at 10:15 a.m., Defendant emailed Garrett stating: "I'm following up

with you on the information that was given to you in January. I'm not able to reach you on the

number I have written down for you. . . . Can you please update me with your current number so

I may ring [you]?" *Id.* Garrett responded at 10:23 a.m., on August 9, 2017, and advised

Defendant that due to the "nature of [his] request and what [he] want[ed] to share," it was

necessary to conduct the conversation via email rather than on the telephone. (Parker Decl., Ex.

14 at 1.) At 10:25 a.m., on August 9, 2017,[3] Defendant called Miller and left the following

voicemail:

---

[3] Although the cover page of Exhibit 5 indicates it is a transcript of a telephone message
recorded August 9, 2018, the parties agree it is the transcript of the voicemail Defendant left on
August 9, 2017.

PAGE 3 – OPINION AND ORDER

Hi, Tina. It's Brett Simic, down in California. It's about 10:25, on August 9th. We spoke on January 17th regarding a student that seems to -- wanting to claim residency in the great state of Washington for tuition purposes. Last name was Steindorf, S-T-E-I-N-D-O-R-F; first name is Molly. And I'm wondering if we got a resolution on that.

We have a lot of business interests in the great state of Washington. I'm also an alumni of your school.[4] And that's just not cool. And then I's an impossible situation, because the parents live -- one lives in California. One moved to Oregon in November. And she's not -- she's not a full-time resident based upon the university registrar residency requirements.

So I -- you know, we've had plenty of time to look into this. You and I spoke about it. And then I'm just waiting to -- I want to kind of hear an update, which I'm legally entitled to. . . .

And that was when you were -- first came on at the university. I think you said you were there three months. And there's lots of procedures and all this on checking into this stuff. I'm familiar with them, not as familiar as you.

And I'm just -- and if you need additional information, I'll be happy to provide that with you. . . . Okay. But I do hope to hear back from you when you're caught up, you know, in the next week or a few days.

(Parker Decl., Ex. 5 at 67-68, ECF No. 39-2.) At 11:58 a.m., on August 9, 2017, Defendant

emailed Garrett:

[When] [w]e last talked I provided you with you information on a student that was planning on claiming resident status as work around for higher out of state fees. This would laughable [*sic*] at best.

Father claims student on taxes, gives student money for fees, and listed on health insurance-lives in California. Student visit [*sic*] often.

Mother-lived in California, then moved to Oregon in December '16, and supports student.

Student uses an address on Mercer Island and has part time job. I can't wrap my head around how this person is a Washington Resident. Either can our tax lawyers.

Student's name is Molly Steindorf - should be a rising junior.

---

[4] Defendant is not an alumni of the University of Washington and he has not had any business interests in Washington since 2008. (Parker Decl., Ex. 7 at 87-88, ECF No. 39-2.)

PAGE 4 – OPINION AND ORDER

Hope this will help. If additional information is needed just let me know.

(Parker Decl., Ex. 14 at 1.) Defendant did not have any further communication with the

University of Washington.

In December 2017, Plaintiff began working in Portland, Oregon at Landmark Health as a

physician. On November 20, 2018, the California Attorney General filed an Accusation against

Plaintiff with the Medical Board of California related to Defendant's HIPAA complaint, in

which the Attorney General alleged five causes for discipline including gross

negligence/unprofessional conduct, willful and unauthorized violation of professional

confidence, repeated negligent acts, and failure to maintain adequate and accurate medical

records. (Parker Decl., Ex. 10 at 121-23, ECF No. 39-2.) The facts underlying the Accusation

included "Respondent [Plaintiff] . . . looked at Patient A's [Defendant's] x-ray. Patient A did not

authorize Respondent to look at his x-ray. Patient A was not Respondent's patient." (Parker

Decl., Ex. 10 at 122.) The Attorney General requested that the Medical Board issue a decision

revoking or suspending Plaintiff's Physician's and Surgeon's Certificate; to revoke, suspend, or

deny approval of Plaintiff's authority to supervise physician assistants and advanced practice

nurses; and to order Plaintiff to pay the cost of probation, if relevant. (Parker Decl., Ex. 10 at

124.) Plaintiff disclosed the Accusation to the Medical Director at Landmark Health.

On March 21, 2019, Defendant called Landmark Health and asked if Plaintiff was

employed in their Portland office. Care Coordinator Andrea Marrocco informed Defendant that

Plaintiff was employed by Landmark Health. Marrocco and Defendant then engaged in the

following exchange:

[DEFENDANT]: So do you have access to the internet?

[MARROCCO]: Yes.

PAGE 5 – OPINION AND ORDER

[DEFENDANT]: Can -- I'm not sure -- so there's a pretty serious allegation against Dr. Benaron in the state of California, and I don't know if you guys are aware of that, as her employer.

[MARROCCO]: I am not.

[DEFENDANT]: Do you want me to send it over to you, or do you want to look it up now? Because it's pretty serious. The attorney general's involved. And I think it's impacting the care of your patients in the great State of Oregon.

[MARROCCO]: What can I do for you?

[DEFENDANT]: Well, do you want me to send that over to you, or do you want to take a minute and look it up?

[MARROCCO]: For what purpose exactly?

[DEFENDANT]: Well, I think you guys need to disclose that, when there's a crim- -- when there's pending action against the doctor that has a license -- potential for a license revocation and some jail time potentially. Very serious stuff. And it's my belief that that action, when you actually read the attorney general's filing, that she knew about that and she didn't disclose that to you guys. So who would I -- do you want me to call your Newport Beach office? I mean, who -- who actually hires these doctors?

[MARROCCO]: Do you have a name?

[DEFENDANT]: Well, I'm a consumer in the great state of Oregon,[5] and I'm making you aware of something that I don't think was dis- -- so who -- who handles that for you? Or should I take to (indiscernible) relations?

[MARROCCO]: I'm sorry; can I have your name?

[DEFENDANT]: Well, I'm asking who handles that.

[MARROCCO]: I -- I can give you our HR's phone number.

[DEFENDANT]: Okay. Is that in Oregon or -- because you guys are kind of all up and down the West Coast. It's hard to figure out who really does all this -- this screening for your employees. And it's nothing -- you know, it's nothing you're doing. It's just something you might want to be aware of, as a company.

---

[5] The record reflects Defendant has never been an Oregon resident. The record does not reflect that Defendant was a member or customer of Landmark Health.

[MARROCCO]: Uh-huh.

[DEFENDANT]: So what number would that be?

\* \* \*

[DEFENDANT]: Okay. And that's Newport Beach?

[MARROCCO]: I'm not quite sure where exactly they're located.

[DEFENDANT]: Okay. Okay. So -- right, because -- so all the hiring goes through them?

[MARROCCO]: You know, I -- I'm sure they'll be able to help you out, whatever you're trying to do.

[DEFENDANT]: Okay. Thank you.

(Parker Decl., Ex. 4 at 61-63, ECF No. 39-2.) Later on March 21, 2019, Defendant called

Landmark Health Vice President of Talent Acquisition and HR Operations Alison Sardarian and

left her a voicemail in which he advised her that he had received her telephone number from

Landmark Health's Portland Office and asked her to give him a call. Defendant explained: "It's

definitely an issue that you'll want to know about that impacts Landmark Health and one of its

providers." (Parker Decl., Ex. 15 at 5, ECF No. 39-4.)

On March 21, 2019, at 10:59 a.m., Sardarian forwarded Defendant's voicemail message

to Landmark Health Human Resources Generalist Alexis Williams, as well as a voicemail

message from Plaintiff "who wants to explain." (Decl. of Alexander H. Hill ("Hill Decl."), Ex.

29 at 52, ECF No. 43-3.) Williams spoke to Defendant at 1:15 p.m.[6] on March 21, 2019. After

Williams' conversation with Defendant, she sent an email to Sardarian and two other Landmark

Health employees including Senior HR Director Jeff Oliver, in which Williams explained:

> This seems pretty serious and not something that I am comfortable with. The guy
> is border line taunting me about who we are, who we hire and our selection

---

[6] The transcript of this telephone call is not in the record.

process and asking questions he clearly already knows [the answers to,] but wants me to divulge. I took the call on the recorded line - so you may want to play it back for details. . . . We've played phone tag but he's (Brett - a consumer out of Portland Oregon is all he will tell me about himself). He is asking me to go to the CA medical board and look up Lisa Benaron, MD and verify her license, and the 8 page complaint letter written about her.

His position: Says he has a meeting set up with the attorney general - first week of April. He says that he feels she knew she was in trouble, left her old employer and came to Landmark. He feels this wasn't disclosed by her. He says there is a meeting with the state of Oregon and has already taken it up the ranks in CA. I am not sure who the guy is - could be a doctor, attorney, ex spouse - I don't know but we should look into it. I've not reached out to Lisa.

(Hill Decl., Ex. 29 at 51.) On March 26, 2019, in a series of follow-up emails to Oliver, Williams, Sardarian, and Landmark Health employees Elizabeth Haughton, Jeremy Berman, and Tanetra, Barrett concluded that Defendant's telephone calls were "a personal matter" and Landmark Health did not need to take any further action other than to "look into the potential claims on the website" noted by Defendant. (Hill Decl., Ex. 17 at 16, ECF No. 43-2.)

On April 16, 2019, the California Medical Board issued a Stipulated Settlement and Disciplinary Order against Plaintiff in which the Board ordered that Plaintiff's "Physician's and Surgeon's Certificate . . . shall be and hereby is publicly reprimanded." (Parker Decl., Ex. 11 at 128, ECF No. 39-2.) The Board also ordered Plaintiff to take educational courses on prescribing practices, medical recordkeeping, and ethics. In May 2019, Landmark Health laid off Plaintiff as part of a reduction in force related to the loss of a large client.

On June 11, 2019, Plaintiff filed an action against Defendant in Multnomah County Circuit Court, alleging claims for intentional interference with business relations, false light, harassment, and IIED and seeking damages of $74,999 as well as a permanent injunction. On October 4, 2019, Plaintiff filed an amended complaint in state court in which she alleged the

same claims and sought damages of $850,000 and a permanent injunction. On October 15, 2019, Defendant removed the case to this Court on the basis of diversity jurisdiction.

On November 15, 2019, Landmark Health offered Plaintiff a position as a temporary full-time physician beginning December 23, 2019, and ending January 31, 2020. Plaintiff accepted the position. At some point before January 27, 2020, Landmark Health offered Plaintiff a permanent position as a physician at 80% time and salary. Plaintiff, however, told Landmark Health that due to a lingering fear that Defendant could cause another investigation, she was unable to continue working more than half time. On January 27, 2020, Plaintiff accepted a half-time position as a physician with Landmark Health.

On February 5, 2020, Defendant filed an Answer in which he asserted nine affirmative defenses: failure to state a claim, intervening or supervening cause, unclean hands, statute of limitations, failure to mitigate damages, contributory negligence, substantial truth, fair reporting/fair comment privilege, and action to protect legal right.

On June 26, 2021, Plaintiff filed a Motion for Summary Judgment in which she seeks judgment in her favor on all of her claims as well as Defendant's affirmative defenses of failure to state a claim, unclean hands, statute of limitations, failure to mitigate damages, and contributory negligence. On July 16, 2021, Defendant filed a Cross-Motion for Summary Judgment in which he seeks judgment in his favor on all of Plaintiff's claims.

## LEGAL STANDARDS

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh

PAGE 9 – OPINION AND ORDER

evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

**PRELIMINARY EVIDENTIARY MATTERS**

**I.    DEFENDANT'S PROCEDURAL OBJECTIONS**

Defendant moves to strike Plaintiff's Motion for Summary Judgment on the grounds that it was not timely filed, it does not include the certification required by Local Rule 56(a) that it complies with the word-count limit set out in Local Rule 7-2(b), and Plaintiff failed to comply with Local Rule 7-1.

**A.    Timely Filing**

The Court's February 2, 2021, Order directed the parties to file dispositive motions by June 25, 2021. Plaintiff filed her Motion for Summary Judgment at 12:59 a.m. on June 26, 2021 (*i.e.*, 59 minutes late). Plaintiff's counsel, Robert Parker, explains in his Second Declaration that he completed Plaintiff's motion on time, but he was "unable to get the documents to upload despite repeated attempts." (Second Decl. of Robert Parker at ¶ 2, ECF No. 45-1.) After several hours, Parker determined that exhibit twelve was preventing upload due to "security restrictions that [he] could not remove." *Id.* Parker, therefore, uploaded the packet without exhibit 12 at 12:59 a.m., on June 26, 2021, and contacted the Court during business hours on June 26, 2021, for assistance.

Defendant obviously suffered no prejudice from Plaintiff filing her motion at 12:59 a.m. instead of midnight. In addition, the Ninth Circuit has expressed a preference for resolving cases on their merits. *See, e.g., NewGen, LLC v. Safe Cig, LLC,* 840 F.3d 606, 616 (9th Cir. 2016)

("Cases should be decided upon their merits whenever reasonably possible." (quoting *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986)). Accordingly, the Court denies Defendant's Motion to Strike on the basis that Plaintiff filed her motion 59 minutes late.

### B.    Word-Count Certification

Local Rule 7-2(b) provides that memoranda "may not exceed 11,000 words, or in the alternative, 35 pages" and "[i]f the document exceeds the page limit, then the party must certify compliance with the word-count limit." L.R. 7-2(b). Plaintiff's combined Motion for Summary Judgment and memorandum in support totaled 20 pages. Plaintiff, therefore, was not required to certify compliance with the word-count limit of Rule 7-2(b). Accordingly, the Court denies Defendant's Motion to Strike on the basis that Plaintiff failed to comply with Local Rule 7-2(b).

### C.    Local Rule 7-1

Defendant moves to strike Plaintiff's Motion for Summary Judgment on the basis that Plaintiff failed to comply with the requirement of Local Rule 7-1(b) that motions "may not be combined with any response, reply, or other pleading" because Plaintiff filed her Motion, Parker's Declaration, and the exhibits to Parker's Declaration as one document. LR 7-1(b). Although the Court agrees that Plaintiff did not comply with Local Rule 7-1(b), Defendant fails to identify any prejudice he suffered due to Plaintiff's lack of compliance.[7] In addition, the Ninth Circuit favors deciding cases on their merits, and courts are disinclined to strike motions, especially dispositive motions, "on minor, non-prejudicial technicalities." *Knature Co. v. Duc Heung Grp., Inc.*, No. CV203877DMGAFMX, 2021 WL 2548679, at *1 (C.D. Cal. Apr. 22, 2021) (citing *NewGen*, 840 F.3d at 616); *see also Snow v. ADT, LLC*, No.

---

[7]      In fact, Defendant violated the same local rule by including a motion to strike within his response to Plaintiff's Motion for Summary Judgment. (*See* Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Resp.") at 4-6, ECF No. 40.)

EDCV1921JGBSHKX, 2020 WL 1073964, at *2 (C.D. Cal. Mar. 5, 2020) ("Wherever possible, cases should be resolved on the merits—not on procedural technicalities."). Accordingly, the Court, in the exercise of its discretion, denies Defendant's Motion to Strike on the basis that Plaintiff failed to comply with Local Rule 7-1(b). *See Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983) ("District courts have broad discretion in interpreting and applying their local rules.").

## II.    DEFENDANT'S EVIDENTIARY OBJECTIONS

In his Response to Plaintiff's Motion for Summary Judgment, Defendant objects to exhibits three, eight, thirteen, seventeen, and eighteen to the Declaration of Robert Parker in Support of Plaintiff's Motion for Summary Judgment on the basis that those exhibits are not properly authenticated. Specifically, Defendant notes Parker's Declaration "merely states those documents were produced in discovery," which, according to Defendant, is insufficient to authenticate the documents. (Def.'s Resp. at 9.) Plaintiff asserts the documents are properly authenticated.

### A.    Applicable Law

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e) and *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). At the time the Ninth Circuit decided *Orr*, authentication was "a 'condition precedent to admissibility,' and th[at] condition [was] satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" 285 F.3d at 773 (quoting Fed. R. Evid. 901(a)). The 2010 amendments to Fed. R. Civ. P. 56, however, "eliminate[d] th[is] unequivocal requirement and mandate[d] only that the substance of the proffered evidence would be admissible at trial." *Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 922-23 (D. Nev. 2019) (citing Fed. R. Civ. P. 56); *see*

*also Hartranft v. Encore Cap. Grp., Inc.*, No. 318CV01187BENRBB, 2021 WL 2473951, at *11 (S.D. Cal. June 16, 2021) ("The Court will consider the substance of evidence that would be admissible at trial even if the form of the evidence is improper so long as that same evidence may be admissible in another form.").

At summary judgment, a party may authenticate documents through personal knowledge by attaching them to an "affidavit that meets the requirements of [FED. R. CIV. P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Orr*, 285 F.3d at 774 (quotation omitted). A "proper foundation need not be established[, however,] through personal knowledge but can [also] rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Id.* (citing FED. R. EVID. 901(b) (providing several approaches to authentication); FED. R. EVID. 902 (self-authenticating documents need no extrinsic foundation)).

## B.    Exhibits Three and Eight

Exhibits three and eight to Parker's Declaration are documents produced and BATES stamped by Defendant. Even under the stricter standard in *Orr*, documents produced by a party in discovery are deemed authentic when they are offered by the party opponent. 285 F.3d at 777 n.20. Accordingly, exhibits three and eight are sufficiently authenticated.

## C.    Exhibit Thirteen

Exhibit thirteen to Parker's Declaration is a business document from the University of Washington, features the state seal, and is a machine-generated report from the public office where the exhibit presented is maintained. Public records that come from the office "where items of this kind are kept" are deemed authentic. FED. R. EVID. 901(7). Exhibit thirteen is sufficiently authenticated.

///

///

D.    **Exhibits Seventeen and Eighteen**

Exhibit seventeen to Parker's Declaration is a letter to Plaintiff from Landmark Health's regional director offering Plaintiff a temporary job as a physician at Landmark Health, and is docu-signed by Plaintiff. Exhibit eighteen is an email from Plaintiff to another physician at Landmark Health that contains email signatures of both Plaintiff and the recipient. Plaintiff states in her Declaration that these are "fair and accurate copies" of those documents. The Court concludes this is sufficient to support a finding that exhibits seventeen and eighteen are what Plaintiff claims, and, therefore, they are sufficiently authenticated at the summary judgment stage.

## DISCUSSION

Plaintiff moves for summary judgment on all of her claims and five of Defendant's affirmative defenses. Defendant moves for summary judgment on all of Plaintiff's claims. As explained below, the Court concludes that no material disputes of fact exist as to Plaintiff's claims for intentional interference with business relations, false light, harassment, and IIED, and Plaintiff has failed to satisfy the elements of those claims. However, genuine disputes of material fact exist as to Plaintiff's claim for defamation *per se*. In addition, the Court declines to enter judgment on Defendant's affirmative defenses at this time, but will address the issue in the parties' motions *in limine*.

Accordingly, the Court denies Plaintiff's Motion for Summary Judgment, grants Defendant's Motion for Summary Judgment as to Plaintiff's claims for intentional interference with business relations, false light, harassment, and IIED, and denies the remainder of Defendant's motion.

///

///

PAGE 14 – OPINION AND ORDER

I.      **INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS**

Plaintiff moves for summary judgment on her claim for intentional interference with business relations on the ground that she has established all of the elements of the claim as a matter of law. Defendant moves for summary judgment on the grounds that Plaintiff has not established a sufficient injury to her contractual relationship with either Landmark Health or the University of Washington, nor that Defendant used an improper means or had an improper purpose when he interacted with either Landmark Health or the University of Washington.

A.      **Applicable Law**

To maintain a claim for intentional interference with business relations, a plaintiff must establish: (1) the existence of a professional or business relationship, "which could include, *e.g.*, a contract or a prospective economic advantage"; (2) intentional interference with the relationship; (3) by a third party; (4) "accomplished through improper means or for an improper purpose"; (5) "a causal effect between the interference and damage to the economic relationship"; and (6) damages. *Mays v. United Ass'n Loc. 290 Apprenticeship & Journeymen Training Tr. Fund,* 407 F. Supp. 3d 1121, 1151 (D. Or. 2019) (quoting *McGanty v. Staudenraus,* 321 Or. 532, 535 (1995)).

The plaintiff must also establish "an injury to an economic relationship." *Meyer v. State by & through Or. Lottery,* 292 Or. App. 647, 664 (2018) (citing *Banaitis v. Mitsubishi Bank, Ltd.,* 129 Or. App. 371, 381 (1994)). The "'injury requirement may be satisfied by proof that the defendant caused a third party actually to breach its contract with plaintiff' or by proof that 'defendant's wrongful actions have rendered plaintiff's obligations more onerous or prevented plaintiff from realizing the full benefit of his contract with a third party.'" *Meyer,* 292 Or. App. at 666 (quoting *Banaitis,* 129 Or. App. at 381). Oregon courts, however, have made clear that "[c]onduct that causes a plaintiff to suffer stress in the performance of his or her contract is not

sufficient" to satisfy the injury requirement. *Meyer*, 292 Or. App. at 666 (quoting *Banaitis*, 129 Or. App. at 381).

### B.    Injury to the Economic Relationship

Defendant asserts he is entitled to summary judgment on Plaintiff's claim for intentional interference with business relations because Plaintiff fails to establish a sufficient injury to her economic relationship with either Landmark Health or the University of Washington. Specifically, Defendant points out that Plaintiff was laid off from her job at Landmark Health due to a reduction in force, not due to Defendant's contacts with Landmark Health. In addition, Defendant's contacts with the University of Washington did not cause Plaintiff to have to pay more for tuition or have any effect on Steindorf's ability to attend the University of Washington.

Plaintiff acknowledges that she was laid off from her job at Landmark Health due to a reduction in force rather than as a result of Defendant's contacts. Plaintiff also acknowledges that Defendant's contacts with the University of Washington did not result in Plaintiff or Steindorf paying more tuition or suffering other adverse financial effects. Plaintiff, however, asserts she has established that Defendant's actions caused her such fear that it interfered with her relationships with Landmark Health.[8] Specifically, Plaintiff asserts Defendant's conduct caused her to second-guess her work, to fear having her work presented to the public, and to suffer depression such that she reduced her work hours to half-time.

Oregon courts, however, have concluded the kind of stress or fear effect suffered by Plaintiff in this case is insufficient to satisfy the economic-injury requirement. For example, in *Banaitis*, the Oregon Court of Appeals concluded that "a negative evaluation based on

---

[8] Plaintiff does not allege how Defendant's conduct caused her to feel or act differently in relation to the University of Washington.

falsehoods caused the plaintiff to suffer emotional distress[, but] did not establish that the plaintiff suffered an injury to his contractual relation." 129 Or. App. at 382. Similarly, in *Meyer*, the Oregon Court of Appeals concluded that the plaintiffs failed to satisfy the injury requirement when they alleged their supervisor "subjected them to investigations based on false information, false and misleading allegations, extended suspensions, and onerous supervision." 292 Or. App. at 664 (quotations omitted). The court noted the plaintiffs "did not allege that those actions . . . or any stress relating from those actions, caused [their employer] 'to withhold or reduce any benefits of the employment contract' or caused any other damage to an economic relationship." *Id.* (quoting *Franklin v. Portland Comm. Coll.*, 100 Or. App. 465, 469 (1990)). The court concluded that the plaintiffs did not establish a claim for intentional interference with business relations because they did not allege "that [their supervisor's] actions caused [their employer] to terminate its relationship with plaintiffs or . . . how [their supervisor's] actions - including the increased supervision - 'rendered plaintiff[s'] obligations more onerous or prevented plaintiff[s] from realizing the full benefit of [their] [economic relationship] with [their employer].'" *Meyer*, 292 Or. App. at 664 (quoting *Banaitis*, 129 Or. App. at 381).

In *Franklin*, the Oregon Court of Appeals held the plaintiff did not satisfy the injury requirement when he alleged his supervisor: (1) engaged in "a continuing pattern of discrimination and retaliation toward plaintiff," (2) "issued false reprimands," (3) shoved the plaintiff, (4) "used the racial epithet 'boy,'" (5) "failed to recommend training," (6) "attempted to lock [the plaintiff] in [his supervisor's] office," and (7) "suggested that [the plaintiff] apply for a job" at another employer. 100 Or. App. at 467-69. Although the court found that the supervisor's conduct had resulted in stress that caused the plaintiff to take a total of 280.5 hours of paid sick leave, the court concluded that the facts did not establish an injury to the plaintiff's economic

relationship with his employer sufficient to maintain a claim for intentional interference with business relations. *Id.* at 469. Specifically, the court noted that despite his supervisor's behavior, the "plaintiff's employment contract continued unchanged, and he received all the benefits to which he was entitled." *Id.*

As in *Banaitis*, *Meyer*, and *Franklin,* the record here reflects that Plaintiff continued to receive all of the benefits to which she was entitled under her contract with Landmark Health, as well as all of the benefits of her relationship with the University of Washington. Plaintiff has not demonstrated that any of the benefits of her relationships with either Landmark Health or the University of Washington were reduced or altered due to Defendant's contacts with either organization. The Court, therefore, concludes that Plaintiff has not established that she suffered a sufficient injury to her economic relationship with either Landmark Health or the University of Washington.[9] Accordingly, the Court denies Plaintiff's Motion for Summary Judgment on Plaintiff's claim for intentional interference with business relations, and grants Defendant's Cross-Motion for Summary Judgment on that claim.

## II.    DEFAMATION *PER SE*

Defendant moves for summary judgment on Plaintiff's claim for defamation *per se* on the grounds that Defendant's statements were true and Plaintiff has not established that she suffered any damages as a result of Defendant's statements. Plaintiff moves for summary judgment on her claim for defamation *per se* on the ground that she has established all of the elements of that claim as a matter of law.

///

---

[9] Because the Court concludes Plaintiff has not established a sufficient injury to her economic relationship with either Landmark Health or the University of Washington, the Court does not address Defendant's argument regarding improper means or motive.

A.      **Applicable Law**

"The elements of a claim for defamation are: (1) the making of a defamatory statement;

(2) publication [to a third person] of the defamatory material; and (3) a resulting special harm,

unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm."

*Nat'l Union Fire Ins. Co. of Pittsburgh Penn. v. Starplex Corp.*, 220 Or. App. 560, 584 (2008)

(citation omitted). A defamatory statement "is one that 'would subject another to hatred,

contempt or ridicule [or] tend to diminish the esteem, respect, goodwill or confidence in which

[the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the

other].'" *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1177-78 (D. Or. 2002) (quoting

*Reesman v. Highfill*, 327 Or. 597, 603 (1998)). "Spoken words are actionable *per se* in Oregon

only if they are words tending to injure the plaintiff in his or her profession or business, or if they

impute to plaintiff the commission of a crime involving moral turpitude." *Marleau v. Truck Ins.

Exch.*, 333 Or. 82, 95 (2001) (citation omitted).

"A statement must be both false and defamatory to be actionable. The court determines

whether a statement is capable of a defamatory meaning in context." *Volm*, 237 F. Supp. 2d at

1178. "Truth is a complete defense to defamation." *Id.* (citing *Bahr v. Statesman J.*, 51 Or. App.

177, 180 (1981)). "A statement is true or substantially true if the 'gist' or 'sting' is true, even if

the statement contains slight inaccuracies." *Volm*, 237 F. Supp. 2d at 1178 (citing *Hickey v.

Settlemier*, 116 Or. App. 436, 440 (1992), *aff'd in part and rev'd in part on other grounds*, 318

Or. 196 (1993)). "The rule that makes truth relevant to the 'gist' or 'sting' of the publication

protects the defendant who has got the details wrong but the 'gist' right; but it also works in the

reverse, to impose liability upon the defendant who has the details right but the 'gist' wrong."

*Hickey*, 116 Or. App. at 441 n.2 (quotation omitted). Accordingly, when a "defendant juxtaposes

a series of facts so as to imply a defamatory connection between them, or creates a defamatory

implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Id.* (quotation omitted). "On the other hand, [when a] defendant . . . states all the . . . facts correctly, does not omit facts necessary to put them in context, and does not juxtapose the facts in a farfetched way to create libelous implications, [he] is not liable" even when "the conclusion to be drawn from the facts is clearly defamatory, at least in the case of a public figure." *Id* (quotation omitted). "The difference in the two cases seems to be whether the particular facts were manipulated, omitted, or artificially juxtaposed to create untrue implications; if so, the truth of the particular facts provides no protection; if not, the truth is complete protection." *Id.* (quotation omitted).

In addition, even "a communication that is not defamatory on its face may be defamatory if a reasonable person could draw a defamatory inference from the communication." *Reesman*, 327 Or. at 604. "When 'defamation by implication' is alleged . . . the link between the communication and the defamatory inference must not be too tenuous." *Id.* (quotation omitted). Thus, "when a claim for defamation requires the drawing of a defamatory inference, the inference that the plaintiff seeks to draw from the facially nondefamatory communication must be reasonable." *Id.* (citation omitted).

Finally, "[s]ome defamatory statements are actionable *per se* - that is, without proof of pecuniary loss or special harm. Libel, that is, defamation by written or printed words, is actionable *per se*." *Neumann v. Liles*, 358 Or. 706, 712 (2016) (citing *Hinkle v. Alexander*, 244 Or. 267, 277 (1966)). "Slander, which is defamation by spoken words, also may be actionable *per se* under certain circumstances. For instance, spoken words that injure a plaintiff in his or her profession or trade may constitute slander *per se*." *Neumann*, 358 Or. at 712 (citations omitted).

**B.    Contacts with the University of Washington**

Plaintiff asserts that Defendant's emails and telephone calls to the University of Washington, taken together, created a defamatory implication regarding Plaintiff. Specifically, the contacts implied that she was improperly attempting to obtain in-state tuition for her daughter at the University of Washington. Defendant, however, asserts he did not identify Plaintiff by name in any of his communications with the University of Washington, that he directed his statements towards Steindorf rather than Plaintiff, and, therefore, that Plaintiff has not established she has a claim for defamation based on these statements. Plaintiff, in turn, argues that it is unnecessary for the defendant to name or identify the plaintiff directly when it is clear from the context of a defendant's statements that he is referring to the plaintiff. Plaintiff also asserts that she is not precluded from having a defamation claim against Defendant relating to his statements to the University of Washington by the fact that Steindorf might also have a claim.

Plaintiff relies on *Marr v. Putnam*, 196 Or. 1 (1952), to support her argument. In *Marr*, the plaintiffs had a radio-repair business in which they picked up customers' radios for repair, repaired them, and delivered the repaired radios to the customers. The defendants published an article in the local newspaper that stated in relevant part:

> Slickers Work Radio Racket
>
> Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a 'radio racket' which causes owners to lose their sets and much embarrassment upon the part of the dealer.
>
> The common practice of these slickers is not to operate from any established shop but just give a phone number to call and offer free pick-up service. . . . In most instances . . . the [radio] set is taken away and that is the last the owner sees of his radio.

*Id.* at 7. The plaintiffs brought an action for libel against the defendants "alleging that the article was published of and concerning the plaintiffs and that they were the only persons in the city of

Salem engaged in the radio repair business who maintained a free pickup service and who advertised it in the manner described in the alleged libelous publication." *Id.* at 8. The trial court granted the defendants' motion for summary judgment on the basis that, among other things, there was no proof that the article applied to the plaintiffs. On appeal, the Oregon Supreme Court defined the issue as follows: "Admitting or conceding that the language used would be libelous if it had been directed at the plaintiff personally, is it actionable when directed impersonally at a class or group to which he belongs?" *Marr*, 196 Or. at 19-20. The court concluded it was actionable by the plaintiffs in that case, reversed the grant of summary judgment, and remanded the matter to the lower court. *Id.* at 40.

The *Marr* court noted that generally when "the language is so used as unerringly to point to plaintiff, his right of action is not affected by the fact that it is also applicable to others; and, although the language may not on its face refer to the plaintiff, he may maintain his action if he can establish its application to himself." 196 Or. at 20. The court pointed out that the article was "directed toward a restricted subdivision of a particular class, . . . every person in the city of Salem who carried on the business of repairing radios in the manner described in the publication" and concluded "every member of the group, if there were more than one, as to whom the charges were false, would have a right of action against the defendants." *Id.* at 24. Finally, the court found the defendants' argument that they did not intend to defame the plaintiffs as evidenced by the fact that they were not "acquainted with [the plaintiffs], or had ever heard of them" to be unpersuasive. *Id.* at 27. The court noted that "[t]he question is not who was aimed at, but who was hit." *Id.* at 28. "If the defendant's words have in fact injured the plaintiff's reputation, it is no defense to an action that the defendant intended them to refer to some one else. He should have been more explicit; his secret intention is immaterial." *Id.* (quotation

PAGE 22 – OPINION AND ORDER

omitted). Ultimately, the court concluded that "persons with a knowledge of the circumstances could reasonably have understood upon reading the article that it referred to the plaintiffs and the question whether it did in fact refer to them was for the jury." *Id.*

The Court concludes that Defendant's statements to the University of Washington regarding Steindorf could have been reasonably understood to refer to Plaintiff. Specifically, Defendant referred to Steindorf by name, noted her mother and father did not live in Washington, and suggested Steindorf, and by extension her parents, was trying to improperly obtain in-state tuition. Defendant asserts he did not intend to imply that Plaintiff was involved in the "scheme" to obtain in-state tuition. As the court noted in *Marr*, however, the question is not who Defendant aimed at, but who he hit. On this record, the Court concludes that a reasonable person could have understood from Defendant's comments that he was referring to Plaintiff.

Accordingly, the Court concludes that, taken together, Defendant's statements to the University of Washington were capable of a defamatory meaning. The Court, therefore, concludes there is a dispute of material fact as to whether a reasonable person could "draw a defamatory inference from the communication." *Reesman*, 327 Or. at 604. Accordingly, the Court denies Plaintiff's and Defendant's Motions for Summary Judgment as to the portion of Plaintiff's defamation *per se* claim based on Defendant's contacts with the University of Washington.

### C.    Contacts with Landmark Health

Defendant argues that all of the statements he made to Landmark Health about Plaintiff were true and, therefore, cannot be defamatory. Plaintiff asserts that Defendant's contacts with Landmark Health are a "classic example of implying a defamatory connection between [facts] and creating a defamatory implication by omitting facts" and that Defendant's statements to Landmark Health had a defamatory sting. (Pl.'s Reply in Supp. of M. for Summ. J. at 18, ECF

No. 45.) Specifically, Plaintiff points out that although there was a pending Accusation against Plaintiff before the California Medical Board at the time Defendant called Landmark, Defendant indicated in his communications that the Accusation could result in "jail time," that the charges suggested Plaintiff was a danger to patients, and that Plaintiff had not informed Defendant about the Accusation. Defendant, however, has not identified the basis for his statement that Plaintiff did not tell Landmark Health about the Accusation. In addition, Defendant knew the Accusation resulted from his own report that Plaintiff looked at the x-ray of his dislocated finger after he reached out to her, which is not a matter that calls into question the safety of Plaintiff's patients. Further, although Defendant asserted in his briefs and at oral argument that the charges in the Accusation *may* have been of the kind that under circumstances not present here could result in a jail sentence, Defendant has not provided any evidence that Plaintiff actually faced jail time based on the nature of the pending charges here. (Parker Decl., Ex. 4 at 61.) Moreover, Defendant was aware of facts underlying the charges because he filed the complaint, and it is questionable whether it was objectively reasonable for him to believe under those circumstances that the charges would carry jail time. Finally, Defendant included several false statements about himself and his interest in the matter, including that he was an Oregon resident, that he had set up a meeting with the attorney general, and that he was "meeting with the state of Oregon" about Plaintiff.

The Court concludes on this record that there is a material dispute of fact as to whether Defendant's statements to Landmark implied a defamatory connection between facts or created a defamatory implication by omitting facts, and whether it was objectively reasonable for Defendant to believe the truth of his statements to Landmark Health. Accordingly, the Court

denies Plaintiff's and Defendant's Motions for Summary Judgment as to the portion of Plaintiff's defamation *per se* claim relating to Defendant's contacts with Landmark Health.

### D.    Damages

Defendant argues that he is entitled to summary judgment because Plaintiff has not established that she suffered any damages as a result of Defendant's statements. Plaintiff, however, points out that as to Defendant's emails to the University of Washington, all written defamation constitutes defamation *per se* and, therefore, Plaintiff need not prove damages. *Marleau*, 333 Or. at 94. Defendant acknowledged at oral argument that his emails to the University of Washington would constitute defamation *per* se, and therefore Plaintiff is not required to prove damages.

Plaintiff also asserts that Defendant's spoken statements to Landmark Health and the University of Washington constitute slander *per* se because they injured Plaintiff in her profession or imputed to Plaintiff the commission of a crime involving moral turpitude and, therefore, she need not prove damages. At oral argument, Defendant acknowledged that if Plaintiff proves Defendant's spoken statements to Landmark Health and the University of Washington were defamatory, they would also be slander *per se* and Plaintiff would not be required to prove damages. Accordingly, Plaintiff's failure to prove damages does not bar her claim for defamation *per se*.

## III.    FALSE LIGHT

Defendant moves for summary judgment on Plaintiff's false light claim on the ground that Plaintiff has not established that Defendant's statements were published to the public generally or to a large number of people. Plaintiff moves for summary judgment on the same claim on the basis that she has established all of the elements of that claim as a matter of law.

### A.    Applicable Law

"False light refers to one of four separate theories that comprise the tort commonly known as invasion of privacy." *Muresan v. Phila. Romanian Pentecostal Church*, 154 Or. App. 465, 474 (1998) (citing *Mauri v. Smith*, 324 Or. 476, 482 (1996)). Oregon courts describe the elements of a false light claim as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a)    the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b)    the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Muresan*, 154 Or. App. at 474-75 (quotation omitted). "[L]ike defamation, a false light claim . . . requires publication. However, the publication requirement is different for a false light claim in that the matter published must be to the public generally or to a large number of persons." *Morrow v. II Morrow, Inc.*, 139 Or. App. 212, 220 (1996) (citation omitted). The "element of publication is satisfied by proof that the false information 'reached or was sure to reach either the public generally or a large number of persons in plaintiff's work community.'" *Muresan*, 154 Or. App. at 475 (quoting *Morrow,* 139 Or. App. at 221).

### B.    Landmark Health Contacts

Plaintiff alleges that Defendant placed her in a false light when he contacted Landmark Health and spoke to Marrocco and Sardarian about the pending Accusation before the California Medical Board. Defendant states that he spoke to only two people at Landmark Health and he did so privately. He did not publish information about Plaintiff to the public generally nor did he report it to a large number of people at Landmark Health. Plaintiff responds that Defendant

wanted his statements to Landmark Health to be public as evidenced by the fact that he told Landmark Health that he believed that the California Medical Board Accusation should be disclosed to Landmark Health's patients.

The relevant standard is not whether the defendant *wanted* his statements to be widely published, but rather whether the statements actually reached a large number of people or "were sure" to reach a large number of people. In fact, in the case on which Plaintiff relies, *Muresan,* the Oregon Court of Appeals found the plaintiff had satisfied the publication element when there was "evidence that plaintiffs' entire community of friends, relatives and acquaintances were members of the church and that [one of the defendants] made false statements about plaintiffs in church meetings of hundreds of members at a time." 154 Or. App. at 475.

In contrast, in *Morrow*, the Oregon Court of Appeals found that the plaintiff did not satisfy the publication element when although the defendant stored the offending document on the company's public network drive, the record reflected "the only evidence regarding the publicity . . . was that an anonymous caller knew that [the document] existed on [the] company's data base under a non-descript title." 139 Or. App. at 221. The plaintiff testified at deposition that he was not aware that anyone had seen the document on the public drive other than the individual who prepared the document, the individual to whom the document was addressed, and the anonymous caller. *Id.* The court concluded that the plaintiff failed to establish "an essential element of the tort." *Id*.

The record here reflects that Defendant spoke only to Marrocco, Sardarian, and Williams at Landmark Health; Williams emailed Sardarian, Oliver, and Barrett about Defendant's telephone calls; and Williams, Sardarian, Oliver, Barrett, Haughton, and Berman decided that Defendant's contacts were a personal matter. Plaintiff does not cite any case in which a court has

found that providing information to three individuals, or in which six individuals were made aware of the information, satisfies the publication element of a false light claim. The Court finds that Defendant's contacts with Landmark Health are more similar to those in *Morrow*, and concludes on this record that Plaintiff has failed to establish the publication element of her false light claim with respect to Defendant's contacts with Landmark Health. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment as to Plaintiff's false light claim relating to Defendant's contacts with Landmark Health, and grants Defendant's Cross-Motion for Summary Judgment.

### C.    University of Washington Contacts

Plaintiff alleges Defendant placed her in a false light when he repeatedly emailed and telephoned Garrett and Miller at the University of Washington and asserted that Steindorf had improperly obtained in-state tuition.[10] There is no indication on this record that Garrett or Miller informed a large number of individuals about Defendant's contacts or that it was likely they would do so. In fact, Garrett advised Defendant in her January 17, 2017 email that neither she nor Miller would "be able to comment or report back if we investigate the student you will comment on." (Parker Decl., Ex. 14 at 2.)

The Court finds the circumstances of Defendant's contacts with the University of Washington are more similar to those in *Morrow* and concludes on this record that Plaintiff has failed to satisfy the publication element of her false light claim with respect to Defendant's contacts with the University of Washington. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment, and grants Defendant's Cross-motion for Summary Judgment.

---

[10] The record reflects that at the times Defendant called and emailed Garrett and Miller, Steindorf was paying out-of-state tuition at the University of Washington as a non-resident.

## IV.    CIVIL HARASSMENT

Defendant moves for summary judgment on Plaintiff's civil harassment claim on the grounds that Defendant has not contacted Plaintiff since August 2016, Defendant's statements to others were not threats within the meaning of OR. REV. STAT. § 30.866(1), and Plaintiff has not established that Defendant had the requisite intent. Plaintiff moves for summary judgment on her civil harassment claim on the ground that she has established all of the elements of the claim as a matter of law.

### A.    Applicable Law

To maintain a civil harassment claim under OR. REV. STAT. § 30.866(1), a plaintiff must establish:

(1)    that the respondent engaged in repeated and unwanted contact with the [plaintiff];

(2)    that the [plaintiff] was subjectively alarmed or coerced by the contact and that such alarm or coercion was objectively reasonable;

(3)    that the [plaintiff] subjectively experienced apprehension about personal safety as a result of the contact and that such apprehension was objectively reasonable; and

(4)    that the [defendant] acted with the requisite mental state.

*H.L.P. v. Jones*, 309 Or. App. 108, 113 (2021) (quotations omitted).

Contact is defined in OR. REV. STAT. § 163.730(3) and includes, among other things, "[c]ommunicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person" and "[c]ommunicating with business entities with the intent of affecting some right or interest of the other person." OR. REV. STAT. § 163.730(3)(h) and (i). Contact is "repeated" when it occurs "two or more times." OR. REV. STAT. § 163.730(7). "The contact must be unwanted, and it must cause alarm." *H.L.P.*, 309 Or. App. at 113 (quotation omitted). "'Alarm' is the apprehension or fear resulting from the

PAGE 29 – OPINION AND ORDER

perception of danger." *Van Hoff v. Van Hoff*, 307 Or. App. 620, 625 (2020) (quoting OR. REV. STAT. § 163.730(1)). "Danger in this context means 'a threat of physical injury, not merely a threat of annoyance or harassment.'" *H.L.P.*, 309 Or. App. at 113-14 (quoting *Reitz v. Erazo*, 248 Or. App. 700, 706-07 (2012)).

"Because speech is protected by Article I, section 8, of the Oregon Constitution, [the plaintiff] must demonstrate that any speech-based contact amounts to a 'threat.'" *H.L.P.*, 309 Or. App. at 114 (quotation omitted); *see also Habrat v. Milligan*, 208 Or. App. 229, 237 (2006) ("Potential constitutional problems arise when a [plaintiff] relies on contacts that involve expression. In that circumstance, to avoid constitutional overbreadth problems, the contacts must meet a more stringent standard than the one set out in the statute."). A "threat," in the context of a claim for civil harassment, is a "communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *H.L.P.*, 309 Or. App. at 113 (quoting *Miller v. Hoefer*, 269 Or. App. 218, 223 (2015)). Nevertheless, protected speech "that does not itself qualify as an unwanted contact can . . . be relevant as context for other, nonexpressive contacts." *H.L.P.*, 309 Or. App. at 114 (citing *Habrat,* 208 Or. App. at 237).

OR. REV. STAT. § 30.866 also requires proof of the defendant's mental state, specifically, that the defendant "acted 'intentionally, knowingly, or recklessly respecting the repeated and unwanted nature of the contacts in question.'" *H.L.P.*, 309 Or. App. at 114 (quoting *Delgado v. Souders*, 334 Or. 122, 132 (2002)). "To act intentionally, in this context, means to 'act with a conscious objective to engage in repeated and unwanted contact.'" *H.L.P.*, 309 Or. App. at 114 (quoting *Delgado,* 334 Or. at 133). "To act knowingly means to 'act with awareness that [one] is engaged in repeated and unwanted contact.'" *H.L.P.*, 309 Or. App. at 114 (quoting *Delgado,* 334

Or. at 133). "[T]o act recklessly means to 'be aware of and then consciously disregard a substantial and unjustifiable risk that [one] is engaging in repeated and unwanted contact,' the risk of which 'must be of such a degree that a reasonable person would not have disregarded it.'" *H.L.P.*, 309 Or. App. at 114 (quoting *Delgado*, 334 Or. at 133).

### B.    Contact With Third Parties

Defendant asserts he is entitled to summary judgment on Plaintiff's civil harassment claim because Defendant did not contact Plaintiff after August 2016 and, therefore, Plaintiff has not satisfied the contact element of civil harassment. As noted, however, OR. REV. STAT. § 163.730(3) defines contact and includes "[c]ommunicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person" and "[c]ommunicating with business entities with the intent of affecting some right or interest of the other person." OR. REV. STAT. § 163.730(3)(h) and (i); *see also B.M. v. Deaton*, 307 Or. App. 763, 765 (2020) ("Although the bulk of the contacts at issue involved third parties, it appears that they qualify as contacts for purposes of ORS 30.866.") (citing OR. REV. STAT. § 163.730(3)). Plaintiff's civil harassment claim rests on Defendant's contacts with Landmark Health and the University of Washington, both of which are third parties who have a relationship with Plaintiff. The Court, therefore, concludes that the fact that Defendant did not contact Plaintiff herself, but instead contacted third parties about Plaintiff, does not establish Plaintiff has failed to satisfy the elements of a civil harassment claim.

### C.    Contacts Must Be A Threat

Defendant also asserts he is entitled to summary judgment on Plaintiff's civil harassment claim because his statements were not threats within the meaning of OR. REV. STAT. § 30.866(1). As noted, Oregon courts have held that within the context of a civil harassment claim, the plaintiff must demonstrate that any speech-based contact amounts to a threat, which is defined in

this context as a "communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *H.L.P.*, 309 Or. App. at 113 (quotation omitted).

Defendant contacted Landmark Health and made several statements regarding the California Medical Board's Accusation, and contacted the University of Washington and made statements about Steindorf's status as a Washington resident. Plaintiff testified at deposition that the only time she felt physically threatened by Defendant was when he made his complaint to the California Medical Board in 2016.[11] (Hill Decl., Ex. 4 at 21, ECF No. 43-1.) Plaintiff testified at deposition that when Defendant contacted the University of Washington about Steindorf's residency status, Plaintiff felt "unsafe and upset and powerless . . . and scared that this is never going to end. . . . You know, when is this guy going to leave me alone?" (Hill Decl., Ex. 4 at 36.) Plaintiff, however, did not feel physically threatened by Defendant.

Oregon courts have held under similar or even more egregious circumstances that plaintiffs failed to establish claims for civil harassment. For example, in *Deaton*, the plaintiff presented evidence that the defendant (1) contacted the plaintiff's "employer multiple times alleging (falsely) that [the plaintiff] 'had been doing things' to her with her work uniform on," (2) "falsely reported" to the police that the plaintiff hit her with her car when the defendant was jogging, and (3) parked in front of the plaintiff's house "in the early hours of the morning." 307 Or. App. at 764-65. The court acknowledged that "[e]ach of those contacts was, no doubt, harassing and unsettling. [The defendant's] complaints to [the plaintiff's] employer and to law enforcement triggered investigations that were unquestionably stressful. . . . It is no small thing

---

[11] Plaintiff does not base any of her claims on Defendant's report to the California Medical Board.

to be under investigation by law enforcement or by one's employer." *Id.* at 765. Nevertheless, the court concluded the plaintiff had not established that the contacts satisfied the requirements of OR. REV. STAT. § 30.866. Specifically, the court noted that a civil harassment order "requires evidence that allows an inference that the unwanted contacts made it objectively reasonable to fear that [the defendant] would engage in violence or conduct that would put [the plaintiff] (or her family) at risk of physical injury." *Id.* The court found, however, that there was "no evidence that [the defendant] threatened physical harm to [the plaintiff] . . . [or] that [the defendant] took any other steps that would put the personal safety of [the plaintiff] or her family at risk," nor was there any evidence "that would allow for a finding that any fear of physical injury resulting from [the defendant's] contacts was an objectively reasonable one." *Id.*

Similarly, in *H.L.P.*, the plaintiff and the defendant dated for eighteen months at which point the plaintiff ended their relationship. 309 Or. App. at 109. In the twenty-four hours immediately after their breakup, the defendant called the plaintiff 103 times even though the plaintiff sent the defendant several text messages asking him to stop calling her. *Id.* In the two weeks after their breakup, the defendant sent the plaintiff "numerous text messages." *Id.* at 110. On one occasion, the defendant appeared at 1:50 a.m., at a house that the plaintiff was housesitting. At least once the defendant followed the plaintiff in a parking lot. Finally, the defendant sent a text to the plaintiff's mother in which he claimed the plaintiff was "having sexual relations with a 63-year-old man" and that the plaintiff had been drinking and driving. *Id.* at 111. Nevertheless, the court concluded the plaintiff had not established that the defendant's contacts satisfied the requirements of OR. REV. STAT. § 30.866. Specifically, the court noted "[t]he phone calls and text messages, which undisputedly were expressive contacts, did not contain threats and were, therefore, protected because they would not unequivocally instill in

[the plaintiff] a fear of imminent and serious personal violence . . . [that was] objectively likely to be followed by unlawful acts." 309 Or. App. at 115 (quotation omitted). In addition, the defendant's "false statements about [the plaintiff's] relationship with [a] third party, texted to her mother, are nonthreatening expressive contacts protected by the Oregon Constitution." *Id.* at 116. The court noted the defendant's "calls and text messages were, no doubt, annoying and even troubling. But, even according to [the plaintiff], they did not contain threats directed to her—or to anyone else," accordingly, they did not constitute contact within the meaning of OR. REV. STAT. § 30.866. *See also S.J.R. v. King*, 272 Or. App. 381, 386-87 (2015) (finding that a civil harassment order was inappropriate even though the defendant repeatedly made advances to the plaintiff including sending texts, leaving voicemails, and leaving items at her home, and despite her repeated rejection of his advances, her requests that he stop, and his being told by police not to contact her); *Courtemanche v. Milligan*, 205 Or. App. 244, 250-51 (2006) (finding that a civil harassment order was inappropriate, but noting "[w]e do not, of course, condone [the defendant's] conduct," which was "persistent to the point of being obsessive—and, in some instances, can be most charitably characterized as strange, boorish, and offensive").

Plaintiff here relies on *A.A.C. v. Miller-Pomlee*, 296 Or. App. 816 (2019) to support her assertion that Defendant's behavior satisfies the contact element of OR. REV. STAT. § 30.866. That case, however, is distinguishable. In *A.A.C.*, the plaintiff and defendant "were romantically involved from May 2010 until November 2014." 296 Or. App. at 817. During their relationship, the defendant was "physically and verbally abusive" to the plaintiff and "attempted to control what she wore, to whom she talked, who she was around, and how often she was on her phone." *Id.* at 817-18. After the plaintiff and defendant separated, they met in a parking lot for the defendant to return some of the plaintiff's possessions. "When their conversation did not go as

[the defendant] had wanted it to go, he took his body and slammed [the plaintiff's] body into [the plaintiff's] car." *Id.* (quotations omitted). The plaintiff testified this event "made her feel 'terrified' because (1) [the defendant] had previously hurt [her] and grabbed her throat and (2) it occurred in a public place, in front of people, which demonstrated to [the plaintiff] that [the defendant] had no fear." *Id.* at 818 (quotations omitted). The defendant eventually agreed to a "mutual no contact order," but he did not comply with the terms of the order and instead continued to call the plaintiff and "say abusive things" and to send the plaintiff frequent, abusive text messages. *Id.* "Subsequently, . . . [the defendant] began to send [the plaintiff] text messages that indicated that he was monitoring [her] email communications and tracking her whereabouts." *Id.* The plaintiff then moved for a civil harassment order. It was undisputed that the defendant's actions when he slammed the plaintiff's body into her car constituted one of the two required "predicate contact[s]" for issuance of a civil harassment order. *Id.* at 821. The court concluded the electronic-tracking contact "was unwanted and subjectively alarmed [the plaintiff]: she testified that it really scared and concerned her that [the defendant] knew her location, . . . because she believed that the information gleaned by [the defendant] as a result of that tracking might lead [the defendant] to retaliate against her." *Id.* at 827-28 (quotations and citations omitted). The court also concluded that the plaintiff's "alarm was objectively reasonable given [the defendant's] history of conduct toward" the plaintiff. *Id.* at 828. The court, therefore, concluded a civil harassment order was warranted.

Here, Plaintiff had a much more limited relationship with Defendant than the parties in *A.A.C.*, and the record does not reflect that Defendant was ever physically or verbally abusive to Plaintiff. In addition, there is no indication on this record that Defendant threatened physical harm to Plaintiff or that he took any steps that would put the personal safety of Plaintiff or her

family at risk. The facts of this case are more similar to those in *Deaton* and *H.L.B.*, and on this record the Court concludes that Plaintiff has not established that Defendant engaged in two or more qualifying contacts within the meaning of OR. REV. STAT. § 30.866(1).[12] Accordingly, the Court denies Plaintiff's Motion for Summary Judgment as to Plaintiff's civil harassment claim, and grants Defendant's Cross-motion for Summary Judgment.

## V.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant moves for summary judgment on Plaintiff's IIED claim on the grounds that Defendant's conduct was not an extraordinary transgression of the bounds of socially tolerable conduct, Plaintiff has not established that Defendant caused her severe emotional distress, and Defendant did not intend to cause Plaintiff emotional distress. Plaintiff moves for summary judgment on the same claim on the ground that she has established all of the elements as a matter of law.

### A.    Applicable Law

To maintain an IIED claim, Plaintiff must establish that Defendant intended to inflict severe emotional distress, Defendant's acts were the cause of Plaintiff's severe emotional distress, and Defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *See Babick v. Or. Arena Corp.*, 333 Or. 401, 411 (2002). "Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law." *Harris v. Pameco Corp.,* 170 Or. App. 164, 171 (2000). "Conduct that is rude, boorish, tyrannical, churlish and mean does not support liability for IIED":

> The most important factor is whether a special relationship exists between a
> plaintiff and a defendant. . . . A defendant's relationship to the plaintiff may be

---

[12] Because the Court concludes Plaintiff has not satisfied the contact element of her civil harassment claim, the Court declines to address whether Plaintiff has established Defendant had the requisite intent.

> one that imposes on the defendant a greater obligation to refrain from subjecting
> the victim to abuse, fright, or shock than would be true in arm's-length encounters
> among strangers.

*Schoen v. Freightliner LLC*, 224 Or. App. 613, 627 (2008) (quotations omitted). A special

relationship in the context of an IIED claim is one in which "a heightened duty of care is

imposed because of the plaintiff's reliance on defendant, such as the relationship between a

physician and patient, an attorney and client, or a common-carrier and passenger." *Russi v.

Wissenback*, No. 6:18-CV-01028-AA, 2019 WL 1965830, at *4 (D. Or. Apr. 28, 2019).

**B.    Extraordinary Conduct**

Defendant asserts that he is entitled to summary judgment on Plaintiff's IIED claim

because his conduct in contacting Landmark Health and the University of Washington was not

conduct that was an extraordinary transgression of the bounds of socially tolerable conduct.

Plaintiff and Defendant did not have a special relationship within the context of an IIED

claim. In addition, in cases in which Oregon courts have permitted an IIED claim to proceed to a

jury, the defendant "engaged in conduct that was not [just] aggravating, insensitive, petty,

irritating, perhaps unlawful, and mean." *Clemente v. State*, 227 Or. App. 434, 442-43 (2009).

Those cases also "contained some further and more serious aspect." *Id.* For example, in some

cases the defendant "engaged in, or credibly threatened to engage in, unwanted physical contact

of a sexual or violent nature[;] . . . repeatedly used derogatory racial, gender, or ethnic slurs,

usually accompanied by some other aggravating circumstance[;] . . . [or] exposed the plaintiff to

actual physical danger." *Id.* at 443 (citing *Lathrope-Olson v. Dep't of Transp.*, 128 Or. App. 405,

407-08 (1994); *Franklin,* 100 Or. App. at 471-72; *Whelan v. Albertson's, Inc.*, 129 Or. App. 501,

504-06 (1994); and *Babick*, 333 Or. at 413-14). In other cases, the defendants have engaged in

psychological and physical intimidation, racism, or sexual harassment. *See, e.g.*, *Kraemer v.

Harding*, 159 Or. App. 90, 111 (1999) (the defendant made continued accusations that the

PAGE 37 – OPINION AND ORDER

plaintiff, a school bus driver, was a child sex abuser after multiple investigations concluded that no inappropriate conduct had occurred); *Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 305 (1998) (the defendant's continued "sadistic" harassment of the plaintiff included sexual intimidation, insults, and acts of petty vandalism even after the plaintiff attempted suicide); *Lathrope-Olson*, 128 Or. App. at 408 (the defendant called the plaintiff, a Native American woman, a "squaw"; told her that a squaw was supposed to walk behind her man; stated that all women were good for was between their legs; locked the plaintiff out of the work van in the rain and snow; and threatened to push the plaintiff into the path of oncoming vehicles).

Although Defendant's behavior here was quite troubling, the Court concludes as a matter of law that it was not an extraordinary transgression of the bounds of socially tolerable conduct. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment as to Plaintiff's IIED claim, and grants Defendant's Cross-Motion for Summary Judgment.

## VI. AFFIRMATIVE DEFENSES

Plaintiff moves for summary judgment on five of Defendant's nine affirmative defenses: failure to state a claim, unclean hands, statute of limitations, failure to mitigate damages, and contributory negligence on the basis that Defendant has not presented any evidence of these affirmative defenses. At oral argument, Defendant argued that the Court should not grant summary judgment on any of his affirmative defenses at this stage of the case because Defendant has reserved those defenses for trial.

The parties did not brief the issue of Defendant's affirmative defenses in any meaningful way. Even if they had, the analysis has likely evolved now that only one claim will proceed to trial. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment with respect to Defendant's affirmative defenses, with leave to renew her challenges in pretrial motions *in limine*.

## CONCLUSION

For the reasons stated, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 39) and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 41). The parties shall confer regarding trial dates and send the Court (via email to sbpropdoc@ord.uscourts.gov) at least three agreed-upon trial settings by October 8, 2021.[13]

**IT IS SO ORDERED.**

DATED this 29th day of September, 2021.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[13] The Court intends to require that everyone who appears in the courtroom for trial (including parties, witnesses, counsel, and jurors) are fully vaccinated against COVID-19 at the time of trial (and will allow any unvaccinated witnesses to testify via video), which the Court understands may impact the trial date.

PAGE 39 – OPINION AND ORDER